Shaun P. Martin (Cal. Bar No. 158480)
*smartin@sandiego.edu*
5998 Alcala Park, Warren Hall
San Diego, CA 92110
Telephone: (619) 260-2347
Facsimile: (619) 260-7933

Eleanor Frisch (Cal. Bar No. 304408)
*efrisch@cohenmilstein.com*
Jacob T. Schutz (MNBA #0395648,
admitted *pro hac vice*)
*jschutz@cohenmilstein.com*
COHEN MILSTEIN SELLERS
 & TOLL PLLC
400 South 4th Street # 401-27
Minneapolis, MN 55415
Tel.: (202) 408-4600
Fax: (202) 408-4699

[Additional counsel appear on signature page]

*Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| Alfredo Ramirez, Ramón Santos Castro and Ivan Fernandez, individually and as representatives of a class of all others similarly situated and on behalf of the AMPAM Parks Mechanical, Inc. Employee Stock Ownership Plan (the "AMPAM ESOP" or the "ESOP"),<br><br>    Plaintiffs,<br><br>    v.<br><br>AMPAM Parks Mechanical, Inc., Charles E. Parks III, John D. Parks, John G. | Case No. 5:24-cv-01038-KK (DTBx)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**REDACTED**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: Hon. Kenly K. Kato<br>Courtroom: 3 |

1  Mavredakis, Kushal B. Kapadia, the
2  AMPAM Board of Directors, Neil Brozen,
   Ventura Trust Company, James C. Wright
3  III, Kevin Dow, James Ellis, Steve
   Grosslight, and Mike Matkins,
4
              Defendants.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

# I.    INTRODUCTION

1.    Plaintiffs Alfredo Ramirez, Ramón Santos Castro and Ivan Fernandez bring this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking plan-wide relief on behalf of the AMPAM Parks Mechanical, Inc. Employee Stock Ownership Plan (the "AMPAM ESOP" or the "ESOP") and class-wide relief on behalf of a class of similarly-situated ESOP participants and their beneficiaries as defined below.

2.    AMPAM Parks Mechanical, Inc. (the "Company" or "AMPAM") is a closely held company, employing approximately 1,000 individuals, that provides residential plumbing subcontractor services for multifamily residences.

3.    Charles E. Parks III ("Buddy Parks") and his brother(s) co-founded and owned AMPAM. Buddy Parks and John D. Parks (together, "the Parks Brothers"), along with other AMPAM owners collectively liquidated their interest in AMPAM stock for $247 million in 2019. The Parks Brothers, John Mavredakis, Kushal Kapadia, and any other sellers of AMPAM stock are collectively referred to as the "Sellers" or "Seller Defendants."

4.    To accomplish the sale, the Parks Brothers (who along with other Board members controlled AMPAM) created a retirement plan, the AMPAM ESOP, to purchase their AMPAM stock at an inflated price.

5.    Plaintiffs and other employee-participants (whose ESOP retirement accounts were used to purchase 100% of AMPAM stock from the Sellers) were not given an opportunity to negotiate or otherwise take part in the determination of the price that they paid for AMPAM stock. They only found out about the ESOP Transaction after the ESOP Transaction was completed and the $247 million purchase price was approved, which left the ESOP deeply in debt and allowed the Sellers to cash out their interest in AMPAM.

6.    In fact, rather than involving the employees whose retirement accounts would be used to buy AMPAM, the Parks Brothers hand-picked Neil Brozen and his company, Ventura Trust Company ("Ventura") (together, the "Trustee") as the Trustee of the ESOP. The Trustee was supposed to be an independent third party acting with undivided loyalty to the ESOP and its participants. However, and as discussed *infra*, the Parks Brothers along with other Board members agreed that the Trustee could ***not negotiate at all*** on behalf of the ESOP when purchasing AMPAM from the Sellers. In addition, the Board members maintained control over AMPAM by, among other things, changing its bylaws to limit the Trustee's ability to sell AMPAM in the future without the Board amending the bylaws again to bless any proposed sale. Defendants also sett up a ESOP governance structure that allowed the Board to fire the Trustee if it did not carry out the wishes of the Parks Brothers and other Board members.

7.    The Parks Brothers further cemented their control over the Trustee by agreeing that AMPAM would indemnify the Trustee for all ERISA fiduciary liability in connection with the ESOP Transaction. Specifically, Buddy Parks signed the Trust Agreement on behalf of AMPAM, whereby he agreed that:

> [T]he Company shall indemnify the Trustee for any loss, cost, expense or other damage, including attorney's fees, suffered by the Trustee and resulting from or incurred with respect to any legal proceedings related in any way to the performance of services by the Trustee pursuant to the Plan [ESOP].

The indemnification payments are paid from the Company's assets (after insurance is exhausted), which were owned by the ESOP from at least 2019 until 2023. This form of exculpation is illegal and void under ERISA. *See* ERISA § 410(a), 29 U.S.C. § 1110(a); *Johnson v. Couturier*, 572 F.3d 1067, 1080 (9th Cir. 2009); *Hurtado v. Rainbow Disposal Co.*, 2018 WL 3372752, at *15-16 (C.D. Cal. July 9, 2018).

8.    The Sellers, other Board members at that time, and the Trustee, took several actions to cause the newly-created ESOP to buy AMPAM from the Sellers at an inflated price of $247 million in a single integrated transaction (referred to as the "ESOP Transaction"). Then they sold AMPAM back to the Parks Brothers a few years later for less than the ESOP paid (referred to as the "2023 Resale Transaction").

9.    There is no recognized market for private stock like AMPAM's, and the value of the stock is determined based on an appropriate valuation report or stock appraisal. The valuation documents related to AMPAM's stock were controlled by the Seller Defendants.

10.    Plaintiffs and other employee-participants were not given access to the valuation reports underlying the value of the AMPAM stock in their retirement accounts. Based on Defendants' duty to disclose all relevant information that bears upon their retirement investments in AMPAM, Mr. Ramirez and other employee-participants asked Defendants to provide the valuation reports prior to filing this lawsuit. However, Defendants refused to do so.

11.    Prior to the ESOP Transaction, the Parks Brothers and John G. Mavredakis (together the "Selling Board Members"), pre-negotiated that they would keep their Board seats and that Buddy Parks would remain Chairman of the Board after the ESOP Transaction. This allowed them to retain control over AMPAM's strategy, direction, and other fundamental business decisions. By pre-negotiating that they would keep control of AMPAM's Board, the Selling Board Members retained the power to amend the Company's bylaws and the ESOP's governing documents to determine the Company's strategy and the direction of the business, to sell the Company in future mergers or corporate transactions, and to determine the amount and timing of dividends and stock distributions.

12.     As a result of the pre-agreement that the Selling Board Members would retain control over the Company's strategic direction and management. The purchase price thus should have reflected in a steep discount for the lack of control over the Company. But it did not.

13.     The Board also amended the AMPAM bylaws to add sale restrictions that would limit the Trustee's ability to sell the Company. The purchase price thus should have reflected in a discount for lack of marketability. But it did not.

14.     In fact, the Company's bylaws after the ESOP Transaction promised that the post-Transaction Board would have four members, one of whom was a non-employee of AMPAM, and that within 9 months the Company would appoint an independent fifth director, with two more independent directors to be added within two years of the Transaction. However, three of the four initial Board members were Sellers (Charles Parks, Buddy Parks, and John Mavredakis), while the fourth director was AMPAM Chief Financial Officer James C. Wright III, and the later-added fifth director who was *not* independent—AMPAM CEO Kevin Dow.

15.     The $247 million the ESOP paid was more than the fair market value of AMPAM stock because the Trustee and the stock valuation the Trustee relied on did not adequately take into account that the Selling Board Members kept control over AMPAM in many material respects, including the strategic decisions of the Company.

16.     As an example of their retained control, the Parks Brothers retained a significant interest in AMPAM after 2019 even though Defendants reported to the government and employees that AMPAM became 100% ESOP owned in July 2019. Indeed, a press release published in 2023 indicated that, after the ESOP Transaction,

the Parks Brothers kept a "significant ownership stake in [AMPAM]."[1] Indeed, as a result of the control they retained, the Parks Brothers engineered the sale of AMPAM's stock (again) just a few years later after the ESOP purchased it. The Parks Brothers reported that AMPAM was sold to a newly created shell corporation, Canyonlands Purchaser LLP, which was owned by Buddy Parks and Gemspring Capital Management, LLC ("Gemspring"), a private equity group, and the ESOP was not even mentioned as the owner in 2023.

17.     The October 4, 2023 press release announcing the sale of AMPAM back to Buddy Parks and Gemspring (through the shell corporation was created in April of 2023) **does not even mention the ESOP** as an owner of AMPAM stock in October of 2023. Rather, the press release states, "Co-founder Buddy Parks . . . will remain as Chairman and **maintain** a significant ownership stake in the Company . . . ." *Id.* (emphasis added).

18.     Thus, Buddy Parks publicly acknowledged that he never gave up his ownership of AMPAM in 2019 and that he retained a significant ownership stake in AMPAM from 2019 to 2023, when it was supposedly 100% owned by the ESOP. John D. Parks was identified as a director of AMPAM in 2019 and 2022 filings with the State of Delaware. On information and belief, John Parks also retained an ownership interest in the ESOP from 2019 to 2023.

19.     The Parks Brothers were able to sell AMPAM (along with other Sellers) for $247 million dollars, yet retained control of AMPAM and a hidden ownership interest in AMPAM. The Parks Brothers, who collectively controlled AMPAM from 2019 on, used this control to orchestrate its sale back to themselves through a shell corporation set up with a private equity firm in 2023: Canyonlands Purchaser, LLC.

---

[1]  Gemspring Capital Acquires AMPAM, PR Newswire (Oct. 4, 2023), https://www.prnewswire.com/news-releases/gemspring-capital-acquires-ampam-301946541.html.

20.    In addition to the fact that the ESOP paid too much for AMPAM stock, the financing terms were unreasonable, imprudent and not in the interest of Plaintiffs or other ESOP participants. According to Department of Labor filings, because the ESOP did not have anywhere close to the $247 million the Sellers received for AMPAM stock, the ESOP had to borrow $240.3 million, or 97.3% of the purchase price. Of the total $240 million in debt, the ESOP borrowed $157.5 million from the Sellers themselves (which was guaranteed by the Company) with unreasonable financing terms. The remainder was financed through an external loan obtained by the Company.

21.    This left AMPAM responsible for all $240 million in ESOP Transaction debt and required the Company to divert an estimated $18 million of its cash flow towards annual loan payments following the Transaction. This crippling interest would hamper the Company's ongoing operations and profitability. In short, the debt terms and cash flow requirements needed to pay the debt were not reasonable nor in the best interest of the ESOP participants.

22.    Defendants together orchestrated and carried out the ESOP Transaction and the Resale Transaction to serve the Sellers' interests while the ESOP participants' interests were harmed. The ESOP obtained little control over a company (AMPAM) that was severely limited in terms of marketability to third party buyers and whose operations were impaired by the enormous debt servicing burden. As a result, the long-term value of AMPAM stock was substantially in doubt.

23.    Ultimately, the ESOP Transaction allowed the Parks Brothers to sell a non-controlling interest in AMPAM to the ESOP participants for significantly more than such an interest was worth because the Parks Brothers did not give up full control over AMPAM.

24.    As noted, just four years after the ESOP Transactions, the Parks Brothers engineered the sale of AMPAM's stock (again) back to Buddy Parks and Gemspring through the 2023 Resale Transaction. As mentioned above, the Parks Brothers pretended during the 2023 Resale Transaction that the ESOP never existed by noting in a press release that "Co-founder Buddy Parks . . . will remain as Chairman and **maintain** a significant ownership stake in the Company . . . ." *Id.* (emphasis added).

25.    In two transactions across four years, the Parks Brothers acted as a seller to the ESOP, a buyer from it, and a fiduciary with ultimate responsibility of ensuring the fairness of both of those transactions. Instead, they enriched themselves greatly but caused significant losses to the ESOP.

26.    From at least 2010 to present, the Parks Brothers have continuously remained on the Board of Directors, illustrating how their control over the Company continued uninterrupted despite the sales to the ESOP and to Canyonlands.

27.    Defendants' actions as outlined herein harmed the ESOP and caused Plaintiffs and all other ESOP participants to suffer significant losses to their ESOP retirement savings.

28.    Plaintiffs bring this action to recover the losses suffered by the ESOP and the participants and beneficiaries of the ESOP, to obtain other equitable and remedial relief as provided by ERISA, and to otherwise remedy Defendants' prohibited transactions and fiduciary breaches in violation of ERISA as outlined herein.

## II.    JURISDICTION AND VENUE

29.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

30.    **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, this District, and because ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process.

31.    **Venue**. Venue is proper in this District and this Division because AMPAM Parks Mechanical, Inc. and other Defendants may be found in this District and this Division. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). AMAMP conducts business operations and employs employees found in this District and Division.

### III.    PARTIES

#### A.    Plaintiff Alfredo Ramirez

32.    Plaintiff Alfredo Ramirez is a current employee of AMPAM, who has worked for AMPAM since approximately 2018. Mr. Ramirez was a participant in the ESOP as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Mr. Ramirez was vested in the ESOP and received a payment when the ESOP was terminated in 2023.

33.    Pursuant to California Labor Code § 1198.5, counsel requested personnel files for Plaintiff Alfredo Ramirez and other represented parties (including Wilis Barrios, who brought a prior action alleging similar claims) in writing. Defendants failed to provide the requested documents within the 30 days of receipt of Plaintiff Ramirez's request as required by California Labor Code § 1198.5.

#### B.    Plaintiff Ramón Santos Castro

34.    Plaintiff Ramón Santos Castro is a former employee of AMPAM who worked at AMPAM from approximately 2022 to 2023. Mr. Castro was a participant in the ESOP as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Mr. Castro was vested in the ESOP and received a payment when the ESOP was terminated in 2023.

#### C.    Plaintiff Ivan Fernandez

35.    Plaintiff Ivan Fernandez is a former employee of AMPAM who worked at AMPAM from approximately 2003 to 2014 and from 2017 to 2024. Mr.

Fernandez was a participant in the ESOP as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Mr. Fernandez was vested in the ESOP and received a payment when the ESOP was terminated in 2023.

**D.    Defendant AMPAM Parks Mechanical, Inc.**

36.    <u>Defendant AMPAM Parks Mechanical, Inc.</u> is a multifamily residential plumbing subcontractor that maintains operations and employs individuals (approximately 1,000) throughout California. AMPAM may be found in Riverside and San Bernadino counties. It conducts its business operations (including providing plumbing and mechanical contracting services) in both Riverside and San Bernadino counties.

37.    ERISA provides:

> Every employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan.

ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

38.    AMPAM is or was the current or former employer of all ESOP participants.

39.    The written instrument(s) according to which the ESOP was established and maintained (hereinafter referred to as the "ESOP Plan Document") provide that the Company is a "Named Fiduciary" with authority to control and manage the administration of the ESOP other than the responsibilities expressly delegated to the Trustee in the Plan Document. Because the Directors (i.e., members of the Board of Directors) have all the powers and responsibility of Company, they have the responsibilities and duties of the Company as the Named Fiduciary.

40.    The ESOP Plan Document states that AMPAM (and the Board members through whom AMPAM acts) have the power and duty to "review[] the

performance of the Trustee with respect to the Trustee's administrative duties, responsibilities, and obligations under the Plan and Trust Agreement."

41.    The Trust Agreement states that the Company (acting through its Board members) may terminate the Trustee with 30 days' written notice without cause.

42.    Accordingly, AMPAM is an ERISA fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had/has discretionary control over the ESOP and the ESOP assets and it exercised control over ESOP assets.

43.    The ESOP Plan Document states that AMPAM has the power and duty to "review[] the performance of the Trustee with respect to the Trustee's administrative duties, responsibilities, and obligations under the Plan and Trust Agreement."

44.    At all relevant times, AMPAM acted through its Board members, and the Sellers who owned and controlled AMPAM. Indeed, the Plan Document recognizes that AMPAM may delegate its fiduciary responsibilities to members of AMPAM's Board of Directors.

**E.    The Sellers/Seller Defendants**

45.    Defendant Charles E. Parks III ("Buddy") is the co-founder of AMPAM and has run AMPAM with his brothers and other Board members since approximately the late 1990s. Before and after the ESOP Transaction, Buddy Parks has also served as the Chief Executive Officer ("CEO") and Chairman of the Board of AMPAM and, along with his brothers, controlled AMPAM's strategic decisions. According to a document AMPAM filed with the California Secretary of State and publicly available information, Buddy Parks remains the CEO and Chairman of the Board of AMPAM.

46.    Prior to and after the ESOP Transaction, Buddy Parks was a named fiduciary because, as alleged below, he was/is the Chairman of the Company's Board

from at least 2010 to the present and, in the ESOP governing documents, the Board was given express fiduciary powers over ESOP administration, including the power to appoint or replace the ESOP Trustee. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

47.     Prior to and after the ESOP Transaction, Buddy Parks was a functional fiduciary to the ESOP because he acted for AMPAM by, among other things, signing the ESOP Trust Agreement which appointed Brozen and Ventura to be the ESOP Trustee. As a result, Defendant Buddy Parks had and has discretionary control over the ESOP and indeed exercised and exercises control over the ESOP.

48.     Thus Buddy Parks was both a named fiduciary and functional fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because he had discretionary authority or discretionary control respecting management of the ESOP, exercised authority and control respecting management or disposition of the ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the ESOP.

49.     Defendant Buddy Parks was also a "party in interest" to the ESOP within the meaning of ERISA § 3(14)(A) and (H), 29 U.S.C. § 1002(14) (A) and (H) because he was, at all relevant times, a fiduciary to the ESOP, the Chairman of the Board of Directors, an officer of AMPAM, and/or an owner (or beneficial owner) of more than 10% of AMPAM stock at the time of the Transaction.

50.     Defendant Buddy Parks, along with other Sellers, sold a non-controlling interest in AMPAM to the ESOP for over $247 million dollars, which unjustly enriched him at the expense of ESOP participants.

51.     Defendant John D. Parks, along with his brother Buddy Parks, co-founded AMPAM and, along with other Sellers, sold their interest in AMPAM to the ESOP for over $247 million dollars, which unjustly enriched him at the expense

of ESOP participants. He is currently the President of AMPAM and, along with his brothers, controlled AMPAM's strategic decisions.

52.    Prior to and after the ESOP Transaction, John D. Parks was a named fiduciary because, as alleged below, he was/is a member of the Company's Board from at least 2010 to the present and, the ESOP governing documents granted the Board express fiduciary powers over ESOP administration, including the power to appoint or replace the ESOP Trustee. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

53.    Prior to and after the ESOP Transaction, John D. Parks was an ERISA fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because, as President, he has acted for AMPAM (along with his brothers) to select and appoint Brozen and Ventura to be the the ESOP Trustee, among other things. As President of AMPAM, he had all the fiduciary powers and discretion given to AMPAM in the ESOP governing document; thus, Defendant John D. Parks had/has discretionary control over the ESOP and exercised/exercises control over the ESOP.

54.    Thus John D. Parks was both a named fiduciary and functional fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because he had discretionary authority or discretionary control respecting management of the ESOP, exercised authority and control respecting management or disposition of the ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the ESOP.

55.    Defendant John D. Parks was a "party in interest" to the ESOP within the meaning of ERISA § 3(14)(A) and (H), 29 U.S.C. § 1002(14) (A) and (H) because he was an ESOP fiduciary, AMPAM's President, an officer of AMPAM, and/or an owner (or beneficial owner) of more than 10% of AMPAM at the time of the ESOP Transaction.

56.     Defendant John G. Mavredakis, along with the other Sellers, sold his interest in AMPAM to the ESOP for over $247 million dollars, which unjustly enriched him at the expense of ESOP participants. Defendant Mavredakis was a member of the AMPAM Board from 2010 until August 2023 when AMPAM was resold to a Company created and owned by the Parks Brothers and a private equity firm. He may be found in Riverside County.

57.     John G. Mavredakis was an ERISA fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because, as a member of the board of directors, he has acted for AMPAM (along with the Parks Brothers) to select and appoint Brozen and Ventura as the ESOP Trustee, among other things. As a board director of AMPAM, he had the fiduciary powers and discretion given to the AMPAM Board in the ESOP governing document; thus, Defendant John G. Mavredakis had/has discretionary control over the ESOP and exercised/exercises control over the ESOP.

58.     Thus John G. Mavredakis was both a named fiduciary and functional fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because he had discretionary authority or discretionary control respecting management of the ESOP, exercised authority and control respecting management or disposition of the ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the ESOP.

59.     Defendant John G. Mavredakis was a "party in interest" to the ESOP within the meaning of ERISA § 3(14)(A) and (H), 29 U.S.C. § 1002(14) (A) and (H) because he was an ESOP fiduciary and an AMPAM director.

60.     Defendant Kushal B. Kapadia, along with the other Sellers, sold his interest in AMPAM to the ESOP for over $247 million dollars, which unjustly enriched him at the expense of ESOP participants. Defendant Kapadia founded KKAP Advisors, which advertises, "Our Founder has successfully advised

numerous private equity and institutional investors to manage critical financing and M&A transactions," specifically identifying AMPAM as among those clients. KKAP Advisors' website states it was created in 2020. In discovery responses, AMPAM identified Defendant Kapadia as an "Outside advisor to AMPAM at the time of the Initial Transaction." Defendant Kapadia was a "paid member" of the AMPAM Board "as of Q3 2021," according to a FINRA BrokerCheck report.

61.    Defendants Buddy Parks, John D. Parks, John G. Mavredakis, and Kushal B. Kapadia are collectively referred to as the "Sellers" or "Seller Defendants" who sold their interest in AMPAM to the ESOP for $247 million in 2019.

### F.    Trustee Defendants

62.    Defendant Ventura Trust Company ("Ventura") is a Minnesota corporation with its principal executive office located in Minneapolis, Minnesota.[2] Ventura advertises that it "Lead[s] dozens of ESOP transactions annually" and "Serv[es] over 150 ESOP plans per year."

63.    Closing documents executed in connection with the ESOP Transaction state that Ventura ESOP Fiduciary Services was the Trustee along with Defendant Neil Brozen.

64.    The indemnification provision that requires AMPAM to indemnify Defendant Neil Brozen also requires AMPAM to indemnify Ventura.

65.    Defendant Brozen's Rule 26(a) disclosures state that he sought advice regarding whether to approve the ESOP Transaction from Ventura's Advisory Board

---

2 Ventura Trust Company was formerly named Ventura ESOP Fiduciary Services LLC, a limited liability company formed in Minnesota and using the same principal executive office address. On December 21, 2022, Ventura ESOP Fiduciary Services LLC converted to Ventura Trust Company. References in this Complaint to "Ventura" refer to both names used by the company during the relevant period.

indicating that Ventura was generally involved in the decision to approve the ESOP Transaction.

66.    As the ESOP's independent trustee, Brozen sought and received advice regarding the Initial Transaction from Ventura's Advisory Board in or around June 2019.

67.    <u>Defendant Neil Brozen</u> is an individual residing in Minnesota. Defendant Brozen is President of Ventura. Ventura and Defendant Brozen are collectively referred to herein as the "Trustee."

68.    Defendants Brozen and Ventura served as the Trustee of the ESOP and improperly approved the ESOP Transaction on behalf of the ESOP. As Trustee of the ESOP, the Trustee was both a named fiduciary and functional fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because they had discretionary authority or discretionary control respecting management of the ESOP, exercised authority and control respecting management or disposition of the ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the ESOP.

69.    The Trustee has also been a "party in interest" at all relevant times because, *inter alia*, he is a fiduciary to the ESOP and provides services to the ESOP. ERISA § 3(14), 29 U.S.C. § 1002(14).

70.    Defendant Brozen has been sued multiple times for violations of ERISA based on his actions as a trustee for ESOPs other than the AMPAM ESOP, including by the Secretary of Labor.

**G.    The Board Defendants**

71.    Defendant Buddy Parks has been a member of the AMPAM Board and Chairman since before 2010.

72.    Defendant John D. Parks has been a member of the AMPAM Board since before 2010.

73.     Defendant John G. Mavredakis has been a member of the AMPAM Board since before 2010 until August 2023, when the ESOP sold AMPAM to a company created by the Parks Brothers and a private equity firm.

74.     Defendant James C. Wright III has been a member of the AMPAM Board since before 2010 until October 2019. He was also Chief Financial Officer of AMPAM at the time of the ESOP Transaction.

75.     Buddy Parks, John D. Parks, John G. Mavredakis and James C. Wright III are collectively referred to as the "ESOP Transaction Board Defendants."

76.     Defendant Kevin Dow joined the AMPAM Board in October 2019, when he also served as CEO of AMPAM. He remained on the Board until August 2023 when the ESOP sold AMPAM to a company created by the Parks Brothers and a private equity firm.

77.     Defendant James Ellis joined the AMPAM Board in August 2020 and remained on the Board until August 2023 when the ESOP sold AMPAM to a company created by the Parks Brothers and a private equity firm.

78.     Defendant Steve Grosslight joined the AMPAM Board in August 2020 and remained on the Board until August 2023 when the ESOP sold AMPAM to a company created by the Parks Brothers and a private equity firm.

79.     Defendant Mike Matkins joined the AMPAM Board in September 2022 and remained on the Board until August 2023 when the ESOP sold AMPAM to a company created by the Parks Brothers and a private equity firm.

80.     Defendant Chris Kenney Matkins joined the AMPAM Board in September 2022 and, on information and belief, remains on the Board today.

81.     The members who joined the Board after the ESOP Transaction closed are Kevin Dow, James Ellis, Steve Grosslight, and Mike Matkins and, with the Parks Brothers and John G. Mavredakis, are collectively referred to as the "Post ESOP Transaction Board Defendants."

82.    According to the Plan Documents, the Board has the fiduciary power to appoint the ESOP Trustee.

83.    Additionally, the Trust Agreement for the ESOP provides, "[u]pon resignation or removal of the Trustee, the Board of Directors shall appoint a successor trustee or trustees." The Trust Agreement also states, "[t]he Company (through its Board of Directors) shall have the right at any time" to modify or terminate the Trust Agreement.

84.    The engagement agreement between AMPAM and the ESOP Trustee states that "the Board desires to appoint the Trustee … as trustee of the Trust and to delegate to the Trustee certain fiduciary responsibilities as more fully described in this Agreement." It also states that "The appointment of the Trustee as trustee of the Trust has been duly authorized and approved by the Board or subcommittee thereof and documented in written resolutions adopted by the Board or subcommittee thereof."

85.    The closing documents executed in connection with the ESOP Transaction assume that the members of AMPAM Board of Directors owed fiduciary duties to the ESOP because they refer to an open question as to whether the Board members complied with their fiduciary duties in connection with the ESOP Transaction.

86.    Also, because AMPAM is the ESOP's Named Fiduciary and, under AMPAM's bylaws, the Board may exercise all of its powers, the Board and its members acted as the Named Fiduciary for the ESOP and had the responsibility to ensure that AMPAM was fulfilling its fiduciary duties under ERISA.

87.    Accordingly, the Board Defendants had and/or exercised discretionary authority or discretionary control respecting management of the ESOP and are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

88.    At all relevant times the Board Defendants have been fiduciaries to the ESOP and had a duty to monitor the Trustee.

89.    The Selling Board Members are Buddy Parks, John D. Parks, and John G. Mavredakis.

## IV.    FACTUAL ALLEGATIONS

90.    According to publicly available documents, AMPAM Parks Mechanical, Inc. was a "family-owned business" until the ESOP Transaction in 2019. AMPAM was founded by Buddy Parks and his father decades ago. Since then, the Parks Brothers have run AMPAM with John G. Mavredakis.

91.    In or around 2019, the Parks Brothers decided to sell their stake in the Company by creating a retirement plan (the AMPAM ESOP) that would borrow hundreds of million of dollars to purportedly purchase 100% of the AMPAM stock they owned.

92.    To effectuate the Parks Brothers' sale of their interest, they established the ESOP, an ERISA-protected defined contribution plan where employer contributions made on behalf of employees are invested in the employer's stock (here AMPAM stock). ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6); *see also* 29 C.F.R. § 2550.407d–6 (2022) (definition of the term "employee stock ownership plan").

93.    All employer contributions to the ESOP, invested in employer stock, are part of employee compensation and comprise an important part of employee retirement savings.

94.    Because—and only because—an ESOP contribution qualifies as employee compensation, an employer can deduct the total value of its ESOP contribution from its income tax liability as an ordinary business expense. 26 U.S.C. § 404; 26 C.F.R. § 1.404(a)–1(b) (2022).

95.    Buddy Parks signed the ESOP Trust Agreement between AMPAM and the Trustee wherein he appointed the ESOP Trustee on behalf of the AMPAM Board and/or the Company.

96.    AMPAM and its Board members failed to establish and implement a governance structure for the ESOP Transaction that was in the interest of ESOP participants consistent with their fiduciary duties to monitor the Trustee and ensure that the ESOP did not pay more than fair market value.

97.    And AMPAM and the Board Members (the majority of whom were Sellers) suffered a fundamental, structural conflict of interest. They failed to mitigate their conflicts and failed to adequately and critically evaluate the Trustee to ensure that Brozen and Ventura were performing their Trustee duties appropriately.

98.    The Trust Agreement states that, prior to July 15, 2019, AMPAM (then controlled by the Selling Board Members) appointed the Trustee to the ESOP, which was a fiduciary act that required them to monitor the Trustee and to furnish accurate and complete information concerning AMPAM in connection with the ESOP Transaction.

99.    The Trustee was duty bound to evaluate whether all terms of the ESOP Transaction (including the price paid for AMPAM stock) were adequately investigated, all relevant alternative options were considered, and the ESOP Transaction was in the best interest of ESOP participants. During the ESOP Transaction the Trustee and the Parks Brothers were duty bound to ensure that the ESOP did not pay more than fair market value for the AMPAM stock it purchased.

100.    Yet the Selling Board Members who controlled AMPAM did not select the Trustee because they believed Brozen and Ventura would perform a thorough and rigorous evaluation of the sale price and other Transaction terms. To the contrary, they selected the Trustee because they believed Brozen and Ventura would be easy to deal with, would not negotiate with them, and would approve the

Transaction on terms that were favorable to the Sellers rather than in the best interest of the ESOP and its participants. And that is exactly what happened.

101.   For example, the Trustee's engagement agreement, which was executed by Buddy Parks on behalf of AMPAM, expressly states the "Trustee shall, in his sole and absolute discretion, negotiate the other terms and conditions of the Contemplated Transactions; provided, however, ***nothing*** in the preceding clause ***shall obligate the Trustee to negotiate***[.]"

102.   In other words, Buddy Parks, his fellow Board members, and AMPAM agreed to engagement terms for the Trustee that expressly condoned the Trustee not negotiating at all on behalf of the ESOP.

103.   Another example that the Trustee was eager to please the Sellers who sat on the AMPAM Board and who hired the Trustee is that, prior to the ESOP Transaction, the Trustee pre-negotiated that three of the four Board members (the Selling Board members who would retain a hidden a stake in AMPAM after the ESOP purchased it) would all keep their Board seats even after the ESOP Transaction. Indeed, Buddy Parks would remain Chairman of the Board after the ESOP Transaction. In fact, this agreement that Buddy Parks would keep his seat as Chairman of the Board was publicly known at least one month prior to the completion of the ESOP Transaction. Indeed, Buddy Parks remained the Chairman of the Board after the ESOP Transaction occurred.

104.   The Selling Board Members's ability to ensure that they would retain three seats on AMPAM Board allowed them to keep control over AMPAM after it was supposedly sold to the ESOP. This control included control over AMPAM's strategy, the amount and timing of dividends and stock distributions, and other fundamental business decisions. The Selling Board Members also retained substantial power to amend the Company's bylaws and the ESOP's governing documents.

105.    AMPAM's corporate filings with the California Secretary of State show that Buddy Parks remained the CEO of AMPAM for years after the ESOP Transaction. Specifically, AMPAM's "Statement of Information" filings on November 16, 2021 and April 7, 2023 report Buddy Parks as the CEO of AMPAM. Similarly, a 2022 Annual Franchise Tax Report filed by AMPAM with the State of Delaware lists both Parks Brothers as directors.

106.    In addition, the Selling Board Members effectively controlled the Trustee who was beholden to the Board Members given that they controlled a majority of the Board seats and the Board had the power to fire the Trustee if it did not like the decisions the Trustee made.

107.    In addition, the Trust Document specifically gives AMPAM—which was/is controlled by the Selling Board Members prior to and after the ESOP Transaction—unilateral power to remove the Trustee and gave the Selling Board Members the power to pick the replacement for the Trustee. Thus, the Trustee and any successor Trustee was not truly "independent."

108.    This lack of independence compromised not only the investigation of the Transaction, but also the ongoing management of AMPAM. With limited exception, Plan participants did not have majority power to vote on shareholder matters. Instead, the Trustee, who was hand-picked by the Park Brothers and who could be fired by them at will, held the majority of voting power.[3]

109.    As noted above, the Trustee approved a sale price of $247,026,699 million for 834,331 shares of the Company's stock, or $296.08 per share. This amount exceeded the fair market value of the Company at the time of the Transaction and greater than what a buyer, under no compulsion to buy AMPAM, would have

---

[3] While allocated shares should have come with a right to vote on major corporate transactions, those allocated shares were a minority interest for years after the ESOP Transaction. Thus even these shareholder voting rights were illusory.

paid in an arm's length negotiation for the non-controlling and non-marketable interest sold.

110.   By year-end 2022, AMPAM had contributed a total of $36,230,656 into the ESOP, purportedly for the benefit of employees. Yet, the value of the AMPAM stock in Plaintiffs' and the Class's ESOP accounts was just $22,960,789 with a total of 97,421 shares of AMPAM stock allocated to the ESOP participants' accounts.

111.   The purchase price of $247 million and the Trustee's evaluation and due diligence to justify that price suffered from a number of serious flaws that any prudent and diligent fiduciary, acting in the best interest of the ESOP and its participants, should have discovered.

112.   *First*, the sale price failed to properly take account of the fact that the ESOP did not purchase a controlling interest in AMPAM.

113.   As discussed above, the terms of the sale included a pre-agreement that Selling Board Members would retain their Board seats (which was enough to retain control over AMPAM) and that Buddy Parks would retain his role as Chairman of the Board. Because this allowed the Sellers to retain control over AMPAM's strategic direction and management, the fair market value of AMPAM stock should have reflected a steep discount for the lack of control over the Company. But the actual purchase price did not.

114.   That the ESOP did not obtain a controlling interest in AMPAM (even though its governmental filings states it paid for a controlling interest) is further confirmed by the fact that, just a few years after the ESOP Transactions, the Parks Brothers engineered the sale of AMPAM's stock (again) to a newly created shell corporation, Canyonlands Purchaser LLP, which was owned by the Parks Brothers and Gemspring, a private equity group.

115.   Further, as noted above, Defendant Buddy Parks continued to serve as Chairman of the Company's Board after the Transaction. And, after the ESOP

Transaction, all three Selling Board Members retained their Board seats which allowed them to arrange the sale of AMPAM back to the Park Brothers and a private equity firm.

116.   Because the ESOP participants did not gain meaningful control over AMPAM as a result of the Transaction, the purchase price the ESOP paid should have been heavily discounted to reflect this lack of control. Court decisions have held that discounts for lack of control as high as 40% are appropriate.

117.   Publicly available governmental filings state that the ongoing valuations of AMPAM stock did not include any discount for lack of control. As a result, the ESOP overpaid. Had even a minimal discount for lack of control (10%) been applied, the ESOP would have paid approximately $25 million less than the ESOP actually did; and a 40% discount for lack of control would have resulted in the ESOP paying approximately $100 million less than the ESOP actually did.[4]

118.   Here, the Trustee did not adequately consider which elements of control were actually being transferred via the sale and did not ensure that an appropriate discount for lack of control was used in the valuation of AMPAM stock.

119.   *Second*, Buddy Parks retained a hidden "significant ownership interest" (not just operational control) in AMPAM from 2019 onwards even though the ESOP's reports filed with the government stated that the ESOP owned a 100% interest in AMPAM. In other words, while AMPAM reported to the government that the the Company became 100% ESOP owned in 2019, its October 4, 2023 press release painted a very different picture: that Buddy Parks had always kept a "significant ownership stake in AMPAM."

120.   Indeed, the October 4, 2023 press release announcing the sale of AMPAM back to Buddy Parks and Gemspring (through the shell corporation created

---

[4] The reductions for lack of control illustrated here assume that the Company did not have a significant debt burden prior to the ESOP Transaction.

in April of 2023) ***does not even mention*** the ESOP as an owner of AMPAM stock in October of 2023.

121.    According to the press release, Buddy Parks kept a significant interest in AMPAM to the ESOP from 2019 to 2023 and on information and belief, the same is true for John Parks.

122.    This undisclosed and significant ownership interest that Buddy Parks retained for years after the ESOP Transaction indicates that the price the ESOP paid was more than fair market value.

123.    *Third*, the $247 million price was based on financial information provided by the Parks Brothers (who together ran and controlled AMPAM). Each of them had a personal interest in painting the rosiest picture possible of AMPAM's financial situation and, on information and belief, did so. As Trustee, Defendant Brozen and Ventura had a responsibility to carefully scrutinize the financial projections and other information supplied by the Parks Brothers and other Company insiders, rather than simply taking them at face value. However, no evidence of such scrutinization of the valuation was provided in response to Plaintiffs' counsel's pre-litigation request for information relating to the Transaction.

124.    *Fourth*, simultaneous with the closing of the Transaction, the Board Defendants amended the bylaws of AMPAM to insert a substantial restriction on the saleability of the Company. In particular, Section 7.7 entitled "Ownership Restriction" required that substantially all of AMPAM shares shall be owned by the employees only, including the ESOP as an employee stock ownership trust. This provision substantially limited the ESOP's ability to sell AMPAM after the ESOP Transaction and thus should have resulted in material discount for lack of marketability. Section 9.1 of the Bylaws precludes amendment except by a majority vote of the Board of Directors, meaning that the Selling Board members retained the power to enforce the marketability restriction (and in turn preserve their power as

Board members by avoiding a sale to a third party who might replace them on the Board).

125.    Not surprisingly, the Post ESOP Transaction Board Defendants voted to amend the bylaws to allow the sale back to the Parks Brothers in the 2023 Resale Transaction.

126.    This significant ownership restriction further solidified the Board's control over AMPAM post Transaction.

127.    Numerous studies that have been conducted to examine the size of marketability discounts ascribed to illiquid investments indicate a range of 10% to as much as 60% would be appropriate.

128.    *Fifth*, the Transaction saddled the ESOP with an enormous debt burden that was effectively underwritten by the Company, which sapped its cash flows and growth potential as an ongoing business enterprise.

129.    The financing terms were not reasonable as they required, in part, for the ESOP (through the Company) to pay the Sellers 8.5% to 9.5% on $158 million in Transaction debt plus pay outside lenders approximately 5% on $93.5 million of additional Transaction debt. In total, it appears that approximately $18 million of the Company's cash flow was required to service the debt to the Sellers and repay the Sellers. This put a tremendous financial strain on the Company's operations and solvency. In addition, this severe drag on the Company's operations and solvency were not adequately reflected in the Transaction sale price nor adequately considered by the Trustee when approving the Transaction terms.

130.    *Sixth*, the Company's business faced significant risks and headwinds at the time of the Transaction that were not adequately reflected in the Company's financial projections.

131.    The ESOP Transaction occurred during a time of great uncertainty in the housing market, especially for multifamily homes built in California, the type of

projects on which AMPAM works. In 2019, the California Assembly passed rent control for multifamily houses with the enactment of Assembly Bill 1482. The law applies to the majority of California's multifamily housing stock and caps annual rent increases at 5 percent plus the rate of inflation, or 10 percent, whichever is lower. The rent control law also requires a property owner to have "just cause" to evict a tenant.

132.   Assembly Bill 1482 was being considered by the California legislature at the time of the ESOP Transaction, and was eventually signed into law.

133.   Additionally, in 2019, housing starts in California experienced their first decline in 10 years.[5] That year, 11% fewer multifamily homes were built.[6] Indeed, 2018 was a high-water mark for multifamily construction starts in California that was followed by a steady decline into at least 2021.[7]

134.   One industry report in the summer of 2019 noted that in the last six months, "developers have pulled back on new development, and half of the panelists stated that they were not planning to start a new development in the next 12 months."[8] Developers expressed a more negative outlook in the 2019 survey than in

---

[5] *Preliminary 2019 Annual Permit Statistics Indicate Housing Shortage*, Constr. Indus. Rsch. Bd. (Feb. 10, 2020), https://www.cirbreport.org/2019-housing-shortage.

[6] *Id.*

[7] Hans Johnson et al., *California's Housing Construction Picks Up Pace*, Pub. Pol'y Inst. of Cal. (June 17, 2021), https://www.ppic.org/blog/californias-housing-construction-picks-up-pace.

[8] *Commercial Real Estate Survey* 12, Allen Matkins & UCLA Anderson Forecast (Issue No. 25, Spring/Summer 2019), https://connect.allenmatkins.com/hubfs/AMCRES_Spring-Summer_2019_FINAL.pdf.

2018 in 5 of the 6 geographic areas examined, with 3 of the 6 having an overall negative outlook.[9]

135.   These substantial headwinds facing the multifamily housing industry, on which AMPAM's financial success depended, were not adequately reflected in the ESOP's purchase price of $247 million.

136.   Because the slump in the multi-family housing interest was not adequately reflected in the Company's financial projections, the stock suffered a sustained reduction in value that was not just due to the transaction debt taken on in 2019.

137.   Indeed, from 2019 to 2020 the AMPAM stock the ESOP owned declined in value by $15.7 million.

138.   Thereafter, the ESOP's 2021 Form 5500 reported a value of $12.69 million, still significantly depressed.

139.   *Seventh*, as part of the Transaction, the Sellers received warrants, which allowed the Sellers to dilute the value of the ESOP's ownership in AMPAM.

140.   The Sellers received ██████ warrants with a strike price of just ██ ███████████████████████████████████████████. Because the strike price was so low, shortly after the Transaction the warrants were in the money and diluted the ESOP's interest in AMPAM such that the Sellers then effectively owned ███ of the fully diluted common stock outstanding.

141.   The warrants had a ██████ expiration, an excessively long period in which the Sellers would retain the right to exercise the warrants. In addition, the interest rates on the Seller Notes were ██████. Based on the interest plus the value of the warrants means, the Sellers were likely to receive ██████████ returns on the loans and warrants together, which was unreasonable and imprudent.

---

[9] *Id.*

142.   In light of the enormous value of the warrants, the ESOP should have paid a lower price to reflect the significant dilution of its interest in AMPAM and/or should have paid a lower interest rate on the Seller Notes.

143.   Because the Trustee failed to engage in an adequate investigation and failed to insist on appropriate discounts for the lack of control and marketability being sold and the dilution caused by the warrants, the ESOP overpaid.

144.   The enormous debt servicing requirements post ESOP Transaction negatively affected AMPAM's long term financial prospects. As noted above, AMPAM had reported a declining equity value that had failed to even recover to the same level as the year the ESOP Transaction closed as of year-end 2021.

145.   Demonstrating that the Selling Board members retained control over AMPAM and could take advantage of the difficult condition in which they placed the ESOP, the Trustee approved the sale of AMPAM to the Parks Brothers just 4 years after the ESOP Transaction.

146.   After years of AMPAM declining in value, in 2023 the Parks Brothers orchestrated the sale of the ESOP's holdings to himself and a private equity firm, Gemspring (the "2023 Resale Transaction"). Defendant Brozen and Ventura as Plan Trustee imprudently and disloyally approved this transaction.

147.   According to the Plan's Form 5500, on August 8, 2023, the Company and the ESOP entered into a stock purchase agreement with Canyonlands Purchaser, LLC to sell all outstanding shares of the Company. Canyonlands Purchaser, LLC is a Delaware entity formed on April 6, 2023 which is owned by Buddy Parks, Gemspring and, on information and belief, John Parks.

148.   Indeed, as discussed, the press release from the time of the sale is written as if the ESOP never existed in the first place. According to the press release, "Co-founder Buddy Parks . . . will remain as Chairman and maintain a significant ownership stake in the Company . . . ." Yet, as reflected in the Plan's 2022 Form

5500, the ESOP held all 834,331 outstanding shares of AMPAM stock at year-end 2022.

149.    Again, the Parks Brothers never gave up control of AMPAM when they sold it to the ESOP as evidenced by the fact that they were able to orchestrate getting AMPAM shares back.

150.    Although Buddy Parks may have wished to pretend the ESOP had never existed, the protections afforded by ERISA are not so easily shirked. Due to Parks Brothers' conflicts as Board members, lenders and to be purchasers of AMPAM, the Trustee was obligated to investigate and give due consideration to alternatives to the resale of AMPAM back to the Parks Brothers and Gemspring via Canyonlands Purchaser LLC. Had the Trustee done so, the marketplace would have produced higher offers and financing alternatives that would have better served the interests of the ESOP and ESOP participants.

151.    The Selling Board Members and the Post ESOP Transaction Board Defendants were required to monitor the Trustee to ensure that the Trustee investigated other potential buyers and maximized the price paid to the ESOP for AMPAM stock. However, because of their unmitigated conflicts of interest, the Selling Board Members and the Post ESOP Transaction Board Defendants failed to appropriately monitor the Trustee prior to the decision to sell AMPAM back to the Parks Brothers and Gemspring.

152.    Ultimately, Plaintiffs and other employee-participants (whose ESOP retirement accounts were used to purchase 100% of AMPAM stock from the Sellers) were not given an opportunity to negotiate or otherwise take part in the determination of the price that they paid for AMPAM stock. Likewise, employee-participants only learned about the the fact that the ESOP sold AMPAM back to the Parks Brothers and a private equity firm after it was completed, and employees had no involvement in the negotiations concerning the price.

## V.    CLASS ACTION ALLEGATIONS

153.    Plaintiffs bring their claims on behalf of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class:[10]

> All participants in the AMPAM ESOP on or after December 28, 2017, and those participants' beneficiaries, excluding Defendants and their immediate family members; any fiduciary of the Plan; the officers and directors of AMPAM or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.

154.    **Numerosity.** The Class satisfies the numerosity requirement because it is composed of hundreds of persons. At the end of 2022, the year before it was terminated, the ESOP had approximately 797 participants. The number of Class members is sufficiently large that joinder of all its members is impracticable.

155.    **Commonality.** This case presents numerous common questions of law and fact, including (among other things):

a.    Whether the ESOP Transaction was a prohibited transaction under ERISA;

b.    Whether the Resale Transaction was a prohibited transaction under ERISA;

c.    Whether the Sellers received more than adequate consideration in connection with the ESOP Transaction;

d.    Whether the ESOP received less than adequate consideration in connection with the 2023 Resale Transaction;

e.    Whether Defendant Brozen and Ventura were a fiduciary to the ESOP as the ESOP Trustee;

---

[10] Plaintiffs reserve the right to revise the class definition and to propose other or additional classes in subsequent pleadings or in their motion for class certification, after discovery in this action.

f. Whether the Trustee engaged in a prudent investigation of the ESOP Transaction and acted in the best interests of the ESOP and its participants in approving the ESOP Transaction;

g. Whether the Trustee engaged in a prudent investigation of the ESOP Transaction and acted in the best interests of the ESOP and its participants in approving the 2023 Resale Transaction;

h. Whether AMPAM, operating through the Parks Brothers, imprudently appointed Brozen and Ventura as Trustee, failed to monitor the Trustee, and imprudently retained the Trustee despite their fiduciary failures, without taking appropriate corrective action;

i. Whether the Parks Brothers were involved in the preparation of the financial projections used in appraisals of AMPAM stock that formed the basis of the ESOP purchase price of $247 million;

j. Whether the Parks Brothers and other Seller Defendants provided misleading or incomplete financial information in connection with the ESOP Transaction or the 2023 Resale Transaction;

k. The amount of losses suffered by the ESOP as a result of the unlawful conduct alleged herein;

l. The proper form of equitable and injunctive relief; and

m. The extent to which any non-fiduciary Defendants are subject to equitable remedies and relief.

156. **Typicality.** Plaintiffs' claims are typical of the claims of the Class because (among other things): (a) they are or were employed by AMPAM and participated in the ESOP; (b) Plaintiffs were injured in the same manner as other Class members in connection with the ESOP Transaction and the inflated price that was paid for the Company; and (c) to the extent that Plaintiffs seek relief on behalf of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), their claims are not only typical of, but the same as, a claim under § 502(a)(2) brought by any other Class member.

157.   **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class and are committed to the vigorous representation of the Class. Plaintiffs' retained counsel, Cohen Milstein Sellers and Toll PLLC, are experienced in class action and ERISA litigation, and Plaintiffs and their counsel have no interests antagonistic to or in conflict with the interests of the Class.

158.   **Rule 23(b)(1)(A).** Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(1)(A). Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of plan participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants relating to the ESOP.

159.   **Rule 23(b)(1)(B).** Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(1)(B). Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the ESOP and engaged in prohibited transactions with respect to the ESOP would, as a practical matter, be dispositive of the interests of the other participants in the ESOP and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class. Further, the relief granted by the Court, including any equitable relief, injunctive relief, or accounting of profits, may be dispositive of the interests of other class members.

160.   **Rule 23(b)(2).** Additionally and alternatively, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class,

making appropriate declaratory and injunctive relief with respect to the Class as a whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations.

161.    **Rule 23(b)(3)**. Additionally and alternatively, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to all Class members predominate over any questions affecting individual members of the Class and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Common questions related to liability will necessarily predominate over any individual questions because Defendants' duties and obligations were uniform as to all ESOP participants and therefore all members of the Class, and whether Defendants breached those duties will center on their conduct rather than the conduct of individual class members. Common questions as to remedies will likewise predominate over any individual issues in light of the plan-wide claims asserted in the action and the nature of the relief sought. Further, a class action is superior to other available methods for resolving the controversy because the claims are brought on behalf of the ESOP, involve an ESOP Transaction impacting all Class members, and the issues in this litigation will be most efficiently resolved in a single proceeding rather than multiple proceedings. The losses suffered by individual Class members are small compared to the expense and burden of individual prosecution of this action. As such, Class members do not have an interest in individually prosecuting their claims, and Plaintiffs are unaware of any similar action filed by another member of the Class. Proceeding on a class-wide basis in this forum will be desirable, manageable, and obviate the need for unduly duplicative litigation which might result in inconsistent judgments.

162.   The names and addresses of the Class members are available from the ESOP and/or the Company, and notice can be provided to all members of the Class to the extent required by Federal Rule 23.

## VI.   CAUSES OF ACTION
### Count I
### Prohibited Transactions in Violation of ERISA § 406(a), 29 U.S.C. § 1106(a)
### (Against Neil Brozen, Ventura, the Parks Brothers, John G. Mavredakis, and AMPAM)

163.   Plaintiffs incorporate the preceding paragraphs as though set forth herein.

164.   ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1) requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, of any property between the plan and a party in interest," "(B) lending of money or other extensions of credit between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

165.   Each of the Defendants named in this Count was a fiduciary as discussed in Section III.D-G above.

166.   The ESOP Transaction involved the sale of property and lending of money between the ESOP and several "parties in interest," and transfer of ESOP assets to parties in interest as discussed in Section III.D-G above.

167.   Similarly, the sale of AMPAM to Gemspring and Buddy Parks in 2023 involved the sale of plan property to "parties in interest" as discussed in Section IV. above.

168.   As set forth in Section IV above, as Trustee, Defendants Brozen and Ventura approved the ESOP Transaction terms, including the price and financing terms, in violation of ERISA § 406(a)(1)(A), (B), and (D), 29 U.S.C.

§ 1106(a)(1)(A), (B), and (D) because the Trustee failed to conduct a prudent investigation of the sale price, financing terms, and other material terms of the Transaction.

169.    Four years later, the Trustee approved the Resale Transaction, whereby the ESOP received less than fair market value when it sold AMPAM to Gemspring and the Parks Brothers. The Trustee approved the Resale Transaction including the transaction terms and price, in violation of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D) without conducting a prudent and loyal investigation into alternative buyers and options that would be in the interest of the ESOP.

170.    Prior to and after the ESOP Transaction and the Resale Transaction, AMPAM, as a Named Fiduciary, and the Selling Board Members (who controlled AMPAM) caused the prohibited transactions to occur through their actions and inactions described above.

171.    Further, each of the Parks Brothers and John G. Mavredakis received significant consideration in connection with the ESOP Transaction and was familiar with the terms of, and parties to, the Transaction. As such, each of them had actual or constructive knowledge that: (i) the Transaction constituted a direct or indirect sale of property between the ESOP and parties affiliated with AMPAM (ERISA "parties in interest"); (ii) the ESOP loans constituted a use of Plan assets by or for the benefit of themselves and other parties in interest; (iii) the ESOP Transaction price was more than fair market value as set forth in Section IV above; (iv) at least Buddy Parks retained an ownership interest in AMPAM after it was supposed to be 100% ESOP owned. Brozen and Ventura were hired for the purpose of ensuring the ESOP Transaction was fair to the ESOP and thus also knew or should have known the aforementioned facts. Yet, in spite of such actual or constructive knowledge, the Parks Brothers, John G. Mavredakis, Brozen, Ventura, and AMPAM took acts to consummate the ESOP Transaction and/or influenced the Trustee to do so, and are

thus liable for violations of ERISA § 406(a)(1)(A), (B), and (D), 29 U.S.C. § 1106(a)(1)(A), (B), and (D).

172.   Similarly, the Parks Brothers, John Mavredakis, Brozen, Ventura, and AMPAM had actual or constructive knowledge that: (i) the sale of AMPAM from the ESOP to Gemspring and Buddy Parks in 2023 constituted a direct or indirect sale of property between the ESOP and parties affiliated with AMPAM (ERISA "parties in interest"); and, (ii) the sale price was less than fair market value as set forth in Section IV above. Yet, in spite of such actual or constructive knowledge, the Parks Brothers, John Mavredakis, Brozen, Ventura, and AMPAM took acts to consummate the sale of AMPAM from the ESOP to Gemspring and Buddy Parks and/or influenced the Trustee to do so, and are thus liable for violations of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D).

173.   Defendants Brozen, Ventura, the Parks Brothers, John G. Mavredakis and AMPAM thus caused the ESOP to pay an inflated price and take on $240 million in debt with unreasonable terms (the ESOP Transaction), which resulted in substantial losses to the ESOP and its participant accounts. Defendants Brozen, Ventura, and the Parks Brothers then used their control over the distressed Company to their advantage and caused the Resale Transaction where Gemspring and the Parks Brothers purchased AMPAM from the ESOP for less than fair market value. They are thus each subject to appropriate relief under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109 for these violations of ERISA.

174.   In addition or alternatively, each of them is liable as co-fiduciaries as set forth in Count IV.

## Count II
## Prohibited Transaction in Violation of ERISA § 406(b), 29 U.S.C. § 1106(b)
## (Against Charles E. Parks III/Buddy Parks, John D. Parks and John G. Mavredakis)

175.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

176.    Each of the Defendants named in this Count was a fiduciary as discussed in Section III.E above.

177.    ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."

178.    As set forth in Sections III.E and IV above, the Parks Brothers and John G. Mavredakis sold their interest in AMPAM and dealt with ESOP assets in their own interest within the meaning of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1). ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2) mandates that a plan fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants." As also set forth in these Sections above, the Parks Brothers then bought an interest in AMPAM from the ESOP and again dealt with ESOP assets in their own interest within the meaning of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

179.    As set forth in Sections III.E and IV above, the Parks Brothers and John G. Mavredakis acted in their own interests and adverse to ESOP's interests in connection with the ESOP Transaction by arranging to receive more than adequate consideration for their shares, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2). Defendant Buddy Parks likewise acted in his own interest and adverse to ESOP's interests in connection with the purchase by Gemspring and Buddy Parks of AMPAM from the ESOP in 2023 by arranging to pay the ESOP less than adequate consideration for its shares, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

180.   ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) prohibits a plan fiduciary from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

181.   As set forth in Sections III.E and IV above, the Parks Brothers and John G. Mavredakis orchestrated the ESOP Transaction and caused themselves to receive consideration (indeed, more than adequate consideration) for their own personal accounts in connection with the ESOP Transaction, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

182.   As set forth in Sections IV above, Buddy Parks orchestrated the 2023 Resale Transaction and caused him to receive consideration (indeed, more than adequate consideration) for their own personal accounts in connection with the ESOP Transaction, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

183.   The Parks Brothers and John G. Mavredakis are therefore subject to appropriate relief under ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3) and ERISA § 409, 29 U.S.C. § 1109 for these violations of ERISA.

**Count III**
**Breach of Fiduciary Duties Under ERISA § 404(a)(1)(A) and (B),**
**29 U.S.C. § 1104(a)(1)(A) and (B)**
**(Against Neil Brozen, Ventura, Charles E. Parks III/Buddy Parks, John D. Parks, John G. Mavredakis, James C. Wright III, AMPAM, and the other Board Defendants)**

184.   Plaintiffs incorporate the preceding paragraphs as though set forth herein.

185.   ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) requires that a plan fiduciary act "for the exclusive purpose of providing benefits to participants and [the] beneficiaries [of the plan.]"

186.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) requires that a plan fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

187.    In the context of a sale of the sponsoring company/employer to an ESOP, the duties of loyalty under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) and prudence under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) require a fiduciary ESOP trustee to undertake a prudent and diligent investigation of the sale price, the financing terms, and other transaction terms and all underlying financial projections and assumptions, in the exclusive interest of the ESOP and its participants without regard to the interests of company insiders who retained the trustee, to ensure that the ESOP and its participants pay no more than adequate consideration for the company's assets.

188.    Each of the Defendants named in this Count was a fiduciary as discussed in Section III.D-G above.

189.    Based on the facts alleged above, Defendants Brozen and Ventura failed to undertake a prudent and appropriate investigation of the terms of the ESOP Transaction and effectively gave a wink and a nod to the Parks Brothers who hired Defendant Brozen and Ventura, instead of serving in a truly independent capacity for the exclusive benefit of the ESOP and its participants.

190.    As alleged above, a prudent and loyal investigation of the relevant ESOP Transaction terms and underlying financial projections and assumptions in connection with the ESOP Transaction would have revealed that the price the ESOP paid was greater than the fair market value of the AMPAM stock at the time of the Transaction, as set forth in Section IV above.

191.    Based on the facts alleged above, Defendants Brozen and Ventura also failed to undertake a prudent and appropriate investigation of the terms of the sale of AMPAM from the ESOP to Gemspring and Buddy Parks in the 2023 Resale Transaction, again failing to serve in a truly independent capacity for the exclusive benefit of the ESOP and its participants.

192.    As alleged above, with respect to the 2023 Resale Transaction, a prudent and loyal investigation of the relevant terms and underlying financial projections and assumptions in connection with the transaction would have revealed that the price received by the ESOP was less than the fair market value of the AMPAM stock at the time of the transaction.

193.    By failing to act prudently and loyally in participants' best interests in connection with the ESOP Transaction and the ongoing management of the ESOP (including the subsequent resale of the Company for less than it was originally purchased), Defendants Brozen and Ventura breached their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B) and caused losses from the ESOP's overpayment in the ESOP Transaction, and receiving less than fair market value for AMPAM in the Resale Transaction, which caused losses to the individual retirement accounts of ESOP participants.

194.    As set forth above, the ESOP Transaction Board Defendants breached their fiduciary duties in connection with the ESOP Transaction by, *inter alia*, selecting Brozen and Ventura as Trustee for self-interested reasons, by providing overly aggressive projections of growth to Defendants Brozen and Ventura, and by ensuring that Buddy Parks remained Chairman of the Board and that John Parks retained control over AMPAM through his role as President.

195.    As also set forth above, the Parks Brothers violated their duties of loyalty and prudence in causing the Trustee, or permitting the Trustee, to approve

the 2023 Resale Transaction for less than the ESOP paid for the stock and less than it was worth.

196.    As alleged above, the Board Defendants were ESOP fiduciaries who were responsible for fulfilling AMPAM's fiduciary duties as set forth in the Plan Document. In addition, the Board's the power to appoint and/or remove the Trustee resulted in their obligation to monitor the Trustee to ensure that it is acting in compliance with the terms of the Plan and in accordance with ERISA. *See* 29 C.F.R. § 2509.75-8 (FR-17) (2023). If the appointed fiduciary has violated or continues to violate ERISA, the monitoring fiduciary must remove the appointed fiduciary and take any other remedial action necessary to address the ERISA violations.

197.    None of the ESOP Transaction Board Defendants adequately monitored the Trustee's performance prior to the ESOP Transaction. As such, they failed to ensure that the Trustee did not allow the ESOP to pay more than fair market value for the AMPAM stock and that the financing terms were reasonable.

198.    None of the Post ESOP Transaction Board Defendants monitored the Trustee's performance prior to the 2023 Resale Transaction. As such, they failed to ensure that the Trustee did not allow the ESOP to receive less than fair market value for the AMPAM stock.

199.    As such, the Parks Brothers, John G. Mavredakis, James C. Wright III, AMPAM, and the other Board Defendants breached their fiduciary duty to monitor the Trustee in compliance with ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B) and other applicable ERISA regulations. Among other things, the Parks Brothers, John G. Mavredakis, AMPAM, and the other Board Defendants:

        a.      failed to monitor and evaluate the performance of theTrustee, or have a system in place for doing so, to ensure that the Trustee conducted a sufficiently rigorous review of the ESOP

Transaction and the 2023 Resale Transaction in compliance with ERISA;

b.    knew and failed to correct the fact that the Trustee was acting based on unrealistic and unreliable financial projections for AMPAM's future revenues, cash flows, and earnings;

c.    knew and failed to correct the fact that the Transaction sale price approved by the Trustee was inflated and exceeded the fair market value of the Company and that the financing terms were unreasonably profitable for the Sellers to the detriment of the ESOP and its sole asset (AMPAM);

d.    knew and failed to correct the fact that the 2023 Resale Transaction sale price approved by the Trustee was below fair market value of the Company;

e.    failed to investigate Defendant Brozen's appropriateness and competence as Trustee which would have identified and then avoided the problems associated with his work in connection with other transactions (*see supra* ¶ 70);

f.    failed to remove the Trustee when they knew that the Trustee's performance was inadequate for the reasons described herein and elsewhere in this Complaint; and

g.    failed to take other appropriate remedial measures to address the Trustee's fiduciary failures as Trustee and the improper approval of the ESOP Transaction (and subsequent resale transaction).

200.  Had AMPAM and the ESOP Transaction Board Defendants properly monitored the Trustee, the ESOP would not have overpaid in the ESOP Transction.

201.  Had AMPAM and the Post ESOP Transaction Board Defendants properly monitored the Trustee, the ESOP would not have received less than adequate consideration for AMPAM in the 2023 Resale Transaction.

202.  Defendants Brozen, Ventura, the Parks Brothers, AMPAM, and the other Board Defendants caused substantial lossess to the ESOP and thus are subject to appropriate relief under ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and

(3) and ERISA § 409, 29 U.S.C. § 1109 for these fiduciary breaches in violation of ERISA.

**Count IV**
**Co-Fiduciary Liability Under ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3)**
**(Against AMPAM and the Board Defendants)**

203.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

204.    Each of the Defendants named in this Count was a fiduciary as discussed in Section III.D and G above.

205.    ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary."

206.    ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach."

207.    ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

208.    The Board Defendants had all management power over AMPAM and/or were involved in and directed the preparation of the financial projections

underlying the stock appraisal AMPAM relied upon in determining (i) the purchase price the ESOP paid for the Company; (ii) the subsequent valuations of AMPAM stock at year-end 2019, 2020, 2021, and 2022; (iii) the price paid to the ESOP in the 2023 Resale Transaction.

209.   Given their intimate knowledge of AMPAM's business, their unique access to Company financial information (and involvement in the preparation of such information), and their appointment of Defendants Brozen and Ventura, AMPAM and the ESOP Transaction Board Defendants knew that the price the ESOP paid for AMPAM stock was inflated and exceeded fair market value and knew that the Trustee failed to prudently and appropriately carry out their duties in approving the ESOP Transaction.

210.   Given their intimate knowledge of AMPAM's business, their unique access to Company financial information (and involvement in the preparation of such information), and their ongoing duty to monitor the Trustee, AMPAM and the Post ESOP Transaction Board Defendants knew that the price the ESOP received for AMPAM stock was below fair market value and knew that the Trustee failed to prudently and appropriately carry out the duties of the Trustee in approving the 2023 Resale Transaction.

211.   Nonetheless, they knowingly participated in the fiduciary violations of the Trustee and concealed them from the ESOP's participants and others by allowing Defendants Brozen and Ventura to continue to serve as Trustee and allowing the ESOP Transaction and the 2023 Resale Transaction to go forward without disclosing, addressing, or remedying those fiduciary violations.

212.  Similarly, by failing to appropriately monitor and address the performance failures of the Trustee, or have a system in place for ensuring that the Trustee conducted a sufficiently rigorous review of the ESOP Transaction and the 2023 Resale Transaction in compliance with ERISA, the Defendants named in this

Count failed to comply with their fiduciary duties which enabled the Trustee to facilitate the ESOP Transaction and 2023 Resale Transaction in breach of the Trustee's fiduciary duties to the ESOP.

213.   As discussed above, the Defendants named in this Count had knowledge of the facts underlying the Trustee's breaches and knowledge that the Trustee was not appropriately monitored, but failed to make reasonable efforts under the circumstances to remedy the breaches.

214.   Under ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3), each of the Defendants named in this Count are liable as co-fiduciaries for Defendants Brozen and Ventura's fiduciary violations.

215.   Had they not violated their co-fiduciary duties, the ESOP would not have suffered the losses alleged herein. They are therefore subject to appropriate relief under ERISA § 409, 29 U.S.C. § 1109 and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3) based on their co-fiduciary liability.

**Count V**
**Equitable Relief Under ERISA § 502(a)(3), 29 U.S.C § 1132(a)(3)**
**(Against Seller Defendants)**

216.   Plaintiffs incorporate the preceding paragraphs as though set forth herein.

217.   Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be held liable under this section regardless of whether it is a fiduciary.

218.   A non-fiduciary transferee of ill-gotten assets of the Plan is subject to equitable restitution of those assets and disgorgement of any profits thereon if the non-fiduciary had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

219.   The Sellers knowingly participated in and profited from the fiduciary breaches and prohibited transactions alleged herein with full knowledge that their stake in the Company was being unlawfully acquired for greater than fair market value.

220.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order restitution of the consideration Sellers received as a result of the ESOP Transaction and disgorgement of any profits thereon, regardless of whether or not the Sellers were fiduciaries to the ESOP. As discussed above, the consideration that the Sellers received impermissibly exceeded the fair market value of their shares. Moreover, the Sellers had actual or constructive knowledge that they were receiving greater than fair market consideration based on, *inter alia*, (i) their personal familiarity with the value of their own equity interests; (ii) their access to the Company's books and records; (iii) their inside knowledge of confidential business and financial information pertaining to AMPAM; (iv) their status as officers or directors of the Company, to the extent they held those roles; and (v) their close personal and/or family relationships to other company insiders.

221.   The Plan Document contemplates that some or all of the Sellers would invest the proceeds of the ESOP Transaction in "qualified replacement property" pursuant to Section 1042 of the Internal Revenue Code in order to avoid capital gains tax on the sale of their AMPAM stock to the ESOP. Under I.R.C. Section 1042, the gains on the sale of the stock to the ESOP are taxed when the qualified replacement property is sold, and capital gains taxes can be entirely eliminated if the qualified replacement property is held by the Sellers until death. Thus, on information and belief, any Sellers who invested the proceeds in qualified replacement property continue to hold such property to avoid the adverse tax consequences.

222.   Each Seller who sought deferral of capital gains pursuant to I.R.C. Section 1042 was required to sign a Statement of Purchase that identified and

declared the specific securities that represented the qualified replacement property that was purchased to avoid taxes on the receipt of proceeds from the ESOP Transaction. The Statement of Purchase for each Seller who elected an I.R.C. Section 1042 deferral would be filed with his or her tax return.

223.    Thus, all consideration to the Sellers in connection with the ESOP Transaction and all profits thereon are in the current possession of the Sellers and are traceable to its current location.

224.    The Sellers cannot retain this consideration to the extent it exceeded the fair market value of their shares.

### Count VI
### Illegal Agreement to Exculpate Fiduciary Liability in Violation of ERISA § 410(a), 29 U.S.C. § 1110(a)
### (Against Trustee, Board Defendants and AMPAM)

225.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

226.    ERISA § 410(a), 29 U.S.C. § 1110(a) provides in relevant part (with exceptions not applicable here) that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [ERISA Part IV] shall be void as against public policy."

227.    AMPAM adopted and/or approved terms of the ESOP Plan Document that state that the Company will indemnify any officer and director of AMPAM and all of its affiliates for "any loss, cost, expense, or other damage, including reasonable attorneys' fees, suffered by such Indemnitee resulting from or incurred with respect to any legal proceedings related in any way to the performance of services by the Indemnitee."

228.    Buddy Parks and AMPAM adopted and/or approved the Trust Agreement with Defendant Brozen, which states that AMPAM will indemnify

Defendant Brozen for "any loss, cost, expense or other damage, including attorney's fees, suffered by the Trustee and resulting from or incurred with respect to any legal proceedings related in any way to the performance of services by the Trustee."

229.   AMPAM adopted and/or approved the Company Bylaws, which states in Article VI that AMPAM will indemnify any officer and director of AMPAM against "reasonable expenses (including attorneys' fees), judgments, fines, penalties, amounts paid in settlement and other liabilities actually and reasonably incurred" from any legal proceeding related to the officer or director's role as officer or director, even for events that occurred *prior to* adoption of the indemnification provision of the Bylaws.

230.   The indemnification and defense provisions in the ESOP Plan Document and the Trust Agreement and Article VI of the Company Bylaws violate ERISA § 410(a), 29 U.S.C. § 1110(a) to the extent that they purport to relieve Defendant Brozen and the Board Defendants of responsibility or liability for violations of ERISA, including the ERISA violations alleged herein.

231.   As such, these provisions must be declared void or inapplicable to the claims alleged herein.

### COUNT VII
### Failure to Comply with California Labor Code Section 1198.5
### (Against AMPAM)

232.   Plaintiffs incorporate the preceding paragraphs as though set forth herein.

233.   California Labor Code Section 1198.5(a) provides, "Every current and former employee, or his or her representative, has the right to inspect and receive a copy of the personnel records that the employer maintains relating to the employee's performance or to any grievance concerning the employee."

234.   California Labor Code Section 1198.5(b)(1) further provides, "Upon a written request from a current or former employee, or his or her representative, the

employer shall . . . provide a copy of the personnel records, at a charge not to exceed the actual cost of reproduction, not later than 30 calendar days from the date the employer receives the request."

235.    An employer's failure to comply within this timeframe entitles a current or former employee to recover a seven hundred fifty dollar $750 penalty from the employer. Cal. Lab. Code § 1198.5(k).

236.    Pursuant to California Labor Code § 1198.5, Plaintiffs' counsel requested personnel files for Plaintiff Alfredo Ramirez and other represented parties in writing on April 2, 2024. Defendants failed to provide the requested documents within 30 days of receipt of Plaintiff Ramirez's request as required by California Labor Code § 1198.5(b)(1).

## VII.   PRAYER FOR RELIEF

237.    Plaintiffs, on behalf of themselves, the ESOP, and the Proposed Class, pray that judgment be entered against Defendants on each Count and that the Court grant the following relief:

A.    Declare that Defendants have violated ERISA as alleged herein;

B.    Enjoin Defendants from engaging in further such violations of ERISA;

C.    Order Defendants to restore all losses to the Plan that resulted from their ERISA violations;

D.    Order the Seller Defendants to disgorge all profits in connection with the ESOP Transaction and deposit them into the Plan;

E.    Order other remedial and equitable relief that the Court deems appropriate, including but not limited to reforming or rescinding the ESOP Transaction and/or the 2023 Resale Transaction, a surcharge against Defendants, an accounting for profits, and a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendants;

F.    Enjoin the Defendants from dissipating any of the proceeds they received from the ESOP Transaction held in their actual or constructive possession until the ESOP participants' rights can be adjudicated;

G.    Enjoin the Defendants from transferring or disposing of any of the proceeds they received from the ESOP Transaction to any person or entity, which would prejudice, frustrate, or impair the ESOP participants' ability to recover the same;

H.    Void the indemnification and defense provisions challenged in Count VI and require the indemnitees to return the cost of their defense to the ESOP;

I.    Require Defendants to pay attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or order payment of fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the Class;

J.    Enter a monetary judgment against AMPAM in favor of Plaintiff Ramirez for $750, plus attorneys' fees and costs pursuant to California Labor Code § 1198.5(l);

K.    Award pre-judgment interest and post-judgment interest as appropriate; and

L.    Award such other and further relief that the Court determines is appropriate pursuant to ERISA § 502(a)(2) and/or (a)(3), 29 U.S.C. § 1132(a)(2) and/or (a)(3), or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure, or that is equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: September 13, 2024          Respectfully Submitted,

By:     *s/ Michelle C. Yau*

Michelle C. Yau (DCBA #980449, MABA #657236, admitted *pro hac vice*)
myau@cohenmilstein.com
Ryan A. Wheeler (Cal. Bar No. 331642)
*rwheeler@cohenmilstein.com*
COHEN MILSTEIN SELLERS
  & TOLL PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699

Eleanor Frisch (Cal. Bar No. 304408)
*efrisch@cohenmilstein.com*
Jacob T. Schutz (MNBA #0395648, admitted *pro hac vice*)
*jschutz@cohenmilstein.com*
COHEN MILSTEIN SELLERS
  & TOLL PLLC
400 South 4th Street # 401-27
Minneapolis, MN 55415
Tel.: (202) 408-4600
Fax: (202) 408-4699

Shaun P. Martin (Cal. Bar No. 158480)
*smartin@sandiego.edu*
5998 Alcala Park, Warren Hall
San Diego, CA 92110
Telephone: (619) 260-2347
Facsimile: (619) 260-7933

*Counsel for Plaintiffs and the Proposed Class*